[Cite as *State v. Hughes*, 2013-Ohio-808.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25152 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 12-CRB-1458 |
| v. | : | |
| | : | |
| ASHLEY T. HUGHES | : | (Criminal Appeal from |
| | : | Dayton Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of March, 2013.

. . . . . . . . . .

JOHN J. DANISH, Atty. Reg. #0046639, by STEPHANIE L. COOK, Atty. Reg. #0067101, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

LORI R. CICERO, Atty. Reg. #0079508, Cicero Law Office, LLC, 500 East Fifth Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1}    Defendant-appellant Ashley Hughes appeals from his conviction and sentence

for Possession of Drug Abuse Instruments, in violation of R.C. 2925.12. He contends that the

trial court erred by overruling his motion to suppress evidence that he claims was obtained as a result of an unlawful search and seizure. He further contends that because he was under the influence of drugs, he did not knowingly, voluntarily and intelligently waive his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to giving statements to the police.

{¶ 2} We conclude that the trial court did not err in overruling the motion to suppress. The facts support a finding that the handcuffing and pat-down of Hughes was justified by a legitimate concern for officer safety. We also conclude that, based upon the evidence in the record, the trial court could conclude that Hughes ability to understand, and intelligently waive, his *Miranda* rights was not vitiated by reason of heroin that he may have injected himself with just prior to his questioning. Accordingly, the judgment of the trial court is Affirmed.

## I. The Traffic Stop and Pat-Down

{¶ 3} One night in early March 2012, Dayton Police Officers Mark Orick and Robert Clingner were on patrol near West Third Street and Gettysburg Avenue. They were heading to a gas station that Orick knew, based upon his experience as an officer, to be "a very high drug area [where] a lot of drug sales are completed." During the previous four years, Orick had been involved in "between seventy-five to one hundred" drug arrests at that location. As they approached the gas station, Orick and Clingner observed a driver, later identified as Hughes, make a sudden turn into the station. As they parked in the alley, the officers noticed the vehicle driven by Hughes head to the "far side" of the station lot and stop

next to a gas pump.

{¶ 4}    As the officers watched the vehicle, they noted that no one entered or exited and the car remained there, running, for approximately "three to five minutes."   Then the vehicle pulled out of the station and headed onto Gettysburg Avenue.   The officers followed the car and noted that the driver failed to utilize a turn signal when turning onto West Third Street.

{¶ 5}    At that point, Orick activated the overhead lights on the patrol car.   Hughes did not stop, but continued on West Third Street.   Hughes then made "a very abrupt" turn into the parking lot of a fast-food restaurant.   Hughes still did not stop, but continued to drive around the restaurant; Orick sounded his air horn twice.   Again, Hughes failed to stop; Orick turned on his siren.   Hughes continued to drive toward the rear of the restaurant, and ran into a trash dumpster, which caused the vehicle to come to a stop.

{¶ 6}    The officers pulled up directly behind Hughes's vehicle, exited, and approached the vehicle.   Orick noted that a female passenger kept looking back and forth over her shoulders at the officers and that Hughes was leaning forward with his hand down toward the front of his seat.   Orick opened Hughes's door, pulled him out of the vehicle, and placed him on his stomach on the ground.

{¶ 7}    Orick proceeded to place handcuffs on Hughes, while his partner dealt with the passenger.   While Orick was on the ground, he observed in Hughes's vehicle a brown, braided leather belt that had been looped.   He also saw a soft drink can that was turned upside down.   The base of the can showed condensation and had a "small piece of brownish-grayish like cotton" in the middle of the can.   Orick recognized the looped belt as something heroin

users use as a tourniquet to aid in the injection of the drug. He also recognized the soda can as something used by heroin users to "process or cook" the heroin.

{¶ 8}     Orick pulled Hughes to his feet and conducted a pat-down to look for weapons. Orick felt, and immediately recognized, a pocket-knife in Hughes's right pocket. Upon removing the knife, Orick noted the knife had a razor blade, rather than a normal knife blade. Orick then began patting down the left pocket when he felt "a long, thin, spherical [sic] item," which he did not remove. Orick asked Hughes whether Hughes was carrying anything that would "poke" or "stick" the officer. Hughes answered affirmatively and indicated that he had a needle. Orick then asked if the needle had a cap, and Hughes again answered affirmatively. Orick requested and received permission to remove the needle. Orick noticed that the syringe contained a brownish-gray substance, which he believed to be heroin.

{¶ 9}     Hughes and the passenger were placed in the back of the police cruiser while the officers checked their identification. The officers discovered that Hughes had a suspended driver's license. Hughes was placed under arrest, and his rights were explained to him. He agreed to speak without the presence of a lawyer, and stated that he had traveled to Dayton to buy heroin and that he had pulled into the gas station lot in order to use the heroin he had purchased.

## II.    The Course of Proceedings

{¶ 10}     Hughes was charged with one count of Possession of Drug Abuse Instruments, in violation of R.C. 2925.12, a second-degree misdemeanor; Failure to Signal, a

minor misdemeanor; Driving Under Suspension, a first-degree misdemeanor; and Failure to Display, a first-degree misdemeanor. He moved to suppress evidence on both grounds of an illegal search and seizure and on grounds that statements had been obtained from him in violation of *Miranda v. Arizona*. Following a hearing, the suppression motion was denied.

{¶ 11} Hughes entered a no-contest plea to all charges. The trial court found him not guilty of the Failure to Display charge, but guilty of the other charges. The trial court sentenced Hughes to 90 days in jail, with 15 days suspended, and with credit for 23 days served, for a total of 52 days. Hughes appeals from his conviction and sentence.

### III. No Evidence Was Obtained as the Result
### of an Unlawful Search and Seizure

{¶ 12} Hughes asserts the following as his sole assignment of error:

THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS.

{¶ 13} Hughes contends that he was "illegally seized when he was removed from the vehicle, handcuffed and patted down in violation of his Fourth Amendment rights."

{¶ 14} "In reviewing a decision of a trial court on a motion to suppress, an appellate court gives broad deference to a trial court's findings of fact. * * * But whether the facts found by the trial court justify suppression of the evidence is a question of law subject to de novo review." *State v. Anderson,* 2d Dist. Montgomery No. 24678, 2012-Ohio-441, ¶ 10.

{¶ 15} Hughes does not dispute the lawfulness of the traffic stop based on a turn-signal violation. *Dayton v. Erickson,* 76 Ohio St.3d 3, 1996-Ohio-431, 665 N.E.2d 1091.

Because the officers directly observed a traffic violation, the stop was valid.

{¶ 16} "Once a lawful stop has been made, the police may conduct a limited protective search for concealed weapons if the officers reasonably believe that the suspect may be armed or a danger to the officers or to others." *State v. Rodriguez,* 12th Dist. Preble No. CA2009-09-024, 2010-Ohio-1944, ¶ 28, quoting *State v. Lawson,* 180 Ohio App.3d 516, 2009-Ohio-62, 906 N.E.2d 443, ¶ 21 (2d Dist.). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *State v. Evans,* 67 Ohio St.3d 405, 422, 1993-Ohio-186, 618 N.E.2d 162, citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In order to justify a pat-down, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Ohio courts have recognized that the need for a protective pat-down becomes more pronounced in situations involving illegal drugs. "The very nexus between drugs and guns can create a reasonable suspicion of danger to the officer." *State v. Thompson,* 1st Dist. Hamilton No. C–050400, 2006-Ohio-4285, ¶ 11.

{¶ 17} Orick's testimony provides a reasonable basis to believe that Hughes might have been armed and dangerous. The area in which the officers first observed Hughes is known for its high rate of drug crimes. Hughes sat in his car for three to five minutes at the gas station without getting out of the vehicle. He then ignored signals to stop his vehicle and continued to drive until he collided with a trash dumpster. Hughes then made a reaching

motion to the front bottom of his seat and Orick was unable to observe what he was doing. Orick testified that in areas known as high drug areas, officers need to be aware of weapons as an officer-safety issue. Moreover, he testified that his "initial belief" was that Hughes may have had a weapon, based upon the motions Hughes made as the officers approached the vehicle. These factors, taken together and viewed objectively through the eyes of the officer on the scene, warrant a reasonable belief that Hughes might have been armed and dangerous, justifying a brief weapons pat-down.

{¶ 18} Orick's concern that Hughes might have had a weapon allowed him to lawfully remove Hughes from the car. *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Given the legitimate concern about weapons and the fact that Orick's partner was on the other side of the vehicle dealing with the passenger, we conclude that it was reasonable for Orick to place Hughes on the ground and place handcuffs on him. *See*, *State v. Payne*, 2d Dist. Montgomery No. 13898, 1994 WL 171215 (May 4, 1994) (hand-cuffing a suspect in the course of an investigative detention does not necessarily turn that investigative detention into an arrest, so long as handcuffing is reasonable under the circumstances – for instance, to maintain the status quo and prevent flight)

{¶ 19} As Orick was handcuffing Hughes, he saw – in plain view – what appeared to be a belt and soda can frequently employed by heroin users. We conclude that these facts taken together gave Officer Orick a reasonable, articulable suspicion justifying a weapons pat-down prior to removing the handcuffs.

## IV.   There Was No *Miranda* Violation

{¶ 20}   Hughes contends that his *Miranda* rights were violated both by questioning before his *Miranda* rights were recited to him, and by questioning after they were recited to him, because he claims that he was under the influence of heroin.   The State concedes that under all of the circumstances, Hughes was in custody when Orick asked him if he had anything on his person that could "poke or stick" Hughes, which was before Orick advised Hughes of his *Miranda* rights.

{¶ 21}   An exception to the requirements of *Miranda v. Arizona* exists when "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."   *New York v. Quarles*, 467 U.S. 649, 657, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

{¶ 22}   " 'The public safety exception allows the police, under certain circumstances, to temporarily forgo advising a suspect of his *Miranda* rights in order to ask questions necessary to securing their own immediate safety or the public's safety.' "   *State v. Strozier* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 23 (2d Dist.), quoting from *State v. Santiago* 9th Dist. Lorain No. 01CA007798, 2002-Ohio-1114.

{¶ 23}   Our holding in *State v. Strozier* is instructive.   In that case, the defendant was asked:   "Do you have anything I need to know about?   Anything that might stick me?"   We concluded that "the avoidance of being stuck by a needle during a lawful pat-down is a legitimate safety concern for police officers."   Id., at ¶ 27.   However, we concluded that the question asked in that case was too broad to fit within the *Quarles* public-safety exception to *Miranda*, because it was not narrowly tailored to address that legitimate concern, but went

beyond the specific concern regarding being stuck by a needle.   *Id.* at ¶ 28.

**{¶ 24}**   In the case before us, Orick's question *was* narrowly tailored to his legitimate concern, after he felt the cylindrical[1] object in Hughes's pocket, that Hughes might have something on his person that would "poke or stick" Orick.   Thus, this case does fit within the *Quarles* public-safety exception to *Miranda*.

**{¶ 25}**   We next address Hughes's claim that his statements made after he was read his *Miranda* rights were not made knowingly, intelligently or voluntarily, because he was under the influence of heroin he had injected at the gas station.

**{¶ 26}**   *Miranda* requires that a suspect be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.   *Miranda* at 479.   The prosecution has the burden to prove, by a preponderance of the evidence, that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights based on the totality of the circumstances.   *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995).

**{¶ 27}**   Orick testified that Hughes did not appear to be under the influence.   He further testified that Hughes "was speaking normally.   He was answering my questions and he was cooperating."   Orick further testified that Hughes was not staggering.   In light of this testimony, we conclude that the trial court reasonably found that Hughes knowingly, intelligently, and voluntarily waived his *Miranda* rights.

**{¶ 28}**   Hughes's sole assignment of error is overruled.

---

[1] Orick referred to the object as "spherical," but from the rest of his description, it is clear that he meant cylindrical.

## V. Conclusion

{¶ 29}   Hughes's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH and WELBAUM, JJ., concur.

Copies mailed to:

John J. Danish
Stephanie L. Cook
Lori R. Cicero
Hon. Christopher D. Roberts