[Cite as *State v. Strickland*, 2013-Ohio-2768.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY   COUNTY

STATE OF OHIO                              :
                                          :        Appellate Case No. 25545
        Plaintiff-Appellant              :
                                          :        Trial Court Case No. 2011-CR-2784
v.                                        :
                                          :
DARION T. STRICKLAND                      :        (Criminal Appeal from
                                          :         Common Pleas Court)
        Defendant-Appellee                :
                                          :

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of June, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box
972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

ANTHONY R. CICERO, Atty. Reg. #0065408, Cicero Law Office, 500 East Fifth Street,
Dayton, Ohio 45402
        Attorney for Defendant-Appellee

. . . . . . . . . . . . .

HALL, J.,

        {¶ 1}    The State of Ohio appeals from the trial court's decision and entry partially

sustaining defendant-appellee Darion Strickland's motion to suppress evidence against him.[1]

{¶ 2} In its sole assignment of error, the State contends the trial court erred in finding that some of Strickland's statements during a custodial interrogation were involuntary under the Fifth Amendment.

{¶ 3} The record reflects that a grand jury indicted Strickland on two counts of aggravated robbery with firearm specifications.[2] He subsequently moved to suppress statements he had made to police. The trial court held an August 24, 2012 hearing on the motion. In a December 14, 2012 suppression ruling, it made the following detailed findings of fact about the interviews:

> On or about the first day of June, 2011 an armed robbery occurred at or about 3236 Salem Avenue in Dayton, Ohio. The allegation was that food and money were taken from a complainant shortly after she left a Walgreen's store or a Mini Mart on Salem Avenue.

> In connection with this robbery incident Defendant, Darion T. Strickland, was interviewed at the Dayton Safety Building. The interview occurred in the late afternoon or evening of June 01, 2011. Defendant came to the Dayton Police Department in the late afternoon of June 01, 2011. Shortly after Defendant arrived at the Safety Building he was placed in an interview room.

> Defendant was seated in the interview room in the Dayton Safety Building

---

[1] Pursuant to Crim.R. 12(K), the State has filed notice that its appeal is not being taken for purposes of delay and that the suppression ruling has rendered its proof so weak that any reasonable possibility of effective prosecution has been destroyed. (Doc. #32).

[2] Because he was a minor at the time of the crimes at issue, Strickland was charged by complaint in juvenile court. Jurisdiction later was transferred to the Montgomery County Common Pleas Court.

located on West Third Street in downtown Dayton. The interview room is windowless. It is relatively small. It contains a small table and three (3) chairs. Defendant was wearing khaki colored shorts and a black t-shirt. He was wearing sneakers.

Detectives Gaier and DeBorde conducted the interview on June 01, 2011. That was the first of the two interviews with the Defendant. Before asking Defendant any questions, the detectives presented Defendant with a "Pre-Interview Form." Detective Gaier dated the form and indicated the place. Detective Gaier also wrote Defendant's name and address on the form. Detective Gaier then asked Defendant if he could read. Defendant indicated that he could not read. So, Detective Gaier read Defendant each of the five (5) enumerated Miranda Warnings. Detective Gaier followed a pattern of reading the warning or right and then having the Defendant acknowledge that he heard and understood the right by orally indicating such.   In addition, the Detective had the Defendant acknowledge understanding of the right by placing his (Defendant's) initials on the form just to the left of the number specified for the particular right. The Pre-Interview Form indicated that the Defendant was being interviewed in reference to homicide and robbery.

Detective Gaier told Defendant that he had a right to remain silent [and] that he did not have to make any statements or answer any questions. Defendant orally indicated that he understood this. Detective Gaier said, "Anything you say can and will be used against you in a court of law." Defendant acknowledged that

he understood. Detective Gaier said, "You have a right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning." Defendant orally acknowledged that he understood this right and wrote his initials to the left of this warning on the form.

Detective Gaier told Defendant, "If you do not have the money to hire a lawyer, a lawyer appointed by the court, or a lawyer from the public defender's office will be provided to you before and during questioning without any cost to you." Defendant acknowledged that he understood this right. Finally, Detective Gaier said, "If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You will also have the right to stop answering at any time until you talk to a lawyer." Defendant, again, acknowledged this right by stating so and also initialing the form.

After Defendant was advised of the five (5) "Miranda Warnings" Defendant was read the waiver paragraph since the Defendant could not read. The Detective read the Waiver of Rights paragraph to the Defendant out loud. The Waiver of Rights paragraph states, "The above statement of rights has been read to me. I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Defendant indicated that he had completed eight (8) years of schooling and signed his name to the form. The form was also witnessed by the Detectives by

affixing their signatures to it.

Defendant was advised of his rights by use of the Pre-Interview Form at about 5:00 p.m. on June 01, 2011 at 335 West Third Street in Dayton. Defendant agreed to speak to the officers and a recorded interview was begun.

The Defendant did ask about the meaning of some words, such as *promises* or *threats*. The Detective gave an explanation. The explanation indicated that the Detectives weren't giving Defendant tangible benefits such as personal property in return for a statement. The explanation further indicated that the Detectives weren't using physical violence against the Defendant to obtain a statement. The explanation did not indicate that promises could be for more favorable treatment than other defendants in the criminal prosecution and disposition of the case.

The Detective went through the rights on the Pre-Interview Form quickly. He did not pause very often. He treated the matter as if it was routine and perfunctory and not an important event that should be seriously thought about.

Defendant was provided with water. Defendant indicated that he had slept and had not been up continuously since the night before when some serious, traumatic events had, apparently, occurred.

The Defendant apparently could not read, but he does have some prior experience with the criminal justice system. He has been involved in prior delinquency proceedings in the juvenile court. The Defendant appeared, on this occasion, without a guardian. There is no guardian consent to the interview on June 01, 2011.

Defendant did not appear to be under the influence of drugs or alcohol in the late afternoon of June 01, 2011. He walked without stumbling or swaying. He indicated he understood what he was doing and his responses were appropriate in substance given the nature of the questions. No threats were made against the Defendant in the sense of express threats. No express promises were made.

Defendant's interview lasted about an hour. As indicated, Defendant was given some water and there was a break taken. In the interview the Detectives alternated in their questioning. Sometimes Detective Gaier would ask a question and then Detective DeBorde would become involved. The Detectives essentially played one defendant/suspect against the other. They implied that if Defendant provided them with significant information he would be in a better position than the other suspects. The Detectives, in effect, said that if Defendant spoke with them and was forthcoming he would not suffer as severe a penalty as the other defendants involved. The Detectives said, "That is not snitching. That is saving your ass." The Defendant implicated Carlos McGary and Raylin Holloway. Defendant acknowledged that he knew Carlos and Raylin were planning a robbery before it happened.

The Detectives did not raise their voices. They were calm for the most part. They used a conversational tone and voice and manner. Defendant was released after he provided a DNA sample.

On June 03, 2011 Defendant, Darion T. Strickland, returned to the Dayton Safety Building. Just prior to him arriving at the Safety Building at about 7:30

p.m., Defendant had gone to the Federal Building. Apparently, Federal Agents indicated to Defendant that they were not involved with the case and he should see the Dayton Police. Defendant, accompanied by his guardian, went to the Safety Building.

Carla Hunter was with Defendant on June 03, 2011. She, apparently, consented to his being interviewed by police officers. Her consent is erroneously dated as June 11, 2011. It appears to be a scrivener's error. Carla Hunter is the guardian of Darion Strickland. At the interview Defendant indicated that he was actually staying at an address in Jefferson Township on June 03, 2011. According to him, he was not staying with Carla Hunter on Glenwood Avenue in the City of Dayton.

On June 03, 2011 Detectives Gaier and Ritchey conducted a second formal interview of Defendant at the Safety Building. The interview occurred in a small windowless room with a table and three (3) chairs. Defendant was seated in a chair in a corner of the room. Detective Gaier was located within a few feet of him at the small table. In other words, Defendant was in a corner between the wall and the end of the table. Detective Gaier was on the front side of the table and taking notes, to some extent. Detective Ritchey was diagonally across from Defendant seated in a chair. The officers were in plain clothes and did not have firearms visible on their persons.

Detective Gaier presented Defendant with a Pre-Interview Form. The Pre-Interview Form was exactly like the Pre-Interview Form used on June 01,

2011. Detective Gaier read each of the rights to Defendant. Defendant verbally acknowledged understanding the right and he initialed each right to the left side of the form. Defendant read out loud the Waiver of Rights paragraph. The interview was recorded.

Defendant was clothed in a black t-shirt and tan or light brown shorts. He wore sneakers on his feet. For some reason, presumably air conditioning, Defendant pulled his arms out of his sleeves and into the body or trunk of his t-shirt. His black t-shirt was short sleeved. On June 03, 2011 Defendant was sixteen (16) or seventeen (17) years old and he had completed only eight (8) years of schooling. His guardian was not with him in the room.

This interview on June 03, 2011 is similar, in some ways, to the June 01, 2011 interview. The Defendant provides answers that are appropriate in terms of substance given the questions that were asked. The Defendant did not appear under the influence of drugs or alcohol. He did not appear sleepy or hungry. The Detectives provided him with water. He is given a restroom break. The Detectives' tone is normally conversational and the atmosphere is calm. The Detectives made no express threats and no express promises.

The Defendant is not hesitant about providing some description of the events of the night in question. He provides incriminating evidence against himself and others. It appears the Detectives feel the Defendant is not telling them everything although, in the first thirty five (35) minutes, Defendant provides a great deal of inculpatory statements.

Eventually the Detectives return to their tactic of playing one defendant/suspect against the other. They confront the Defendant with what they assert are the accounts by the other co-defendants. Early in the interview with little or moderate encouragement the Defendant would essentially provide a narrative of what happened. As the interview wore on the Defendant was reticent to speak and provided only short answers.

The Detectives told Defendant that they had recovered the firearm used in the alleged robbery. They reminded the Defendant that he had provided them his DNA two (2) days before. They told him that DNA would be on the firearm that they had. They asserted that he was implicated by others and that, in addition, the police had his DNA on the firearm that was used. It appears the representations were not entirely truthful at that point, although it is true that the police did have the firearm involved and they did have Defendant's DNA. At that time it seems that a laboratory analysis had not been performed that confirmed the existence of Defendant's DNA on the weapon.

Approximately twenty one (21) minutes into the interview Detective Gaier made physical contact with Defendant. Detective Gaier patted Defendant on the

leg a couple of times. This occurred just after the Detectives indicated that others had made admissions about a robbery on the night in question. The officers indicated that they could understand why Defendant might have engaged in a crime because of the intimidating presence and directions of Carlos McGary. After this, the Detectives said that they had to "clear it up now."

(Emphasis sic.) (Doc. #28 at 1-6).

{¶ 4} In its suppression ruling, the trial court held that Strickland validly waived his *Miranda* rights at the outset of the June 1, 2011 interview and that his statements during the interview were voluntary under the Fifth Amendment. Therefore, the trial court found no basis for suppressing any of those statements. (*Id*. at 6-10). With regard to the June 3, 2011 interview, the trial court held that the atmosphere became impermissibly coercive—and Strickand's statements became involuntary under the Fifth Amendment—part way through the interview when Detective Gaier touched Strickland. As a result, the trial court suppressed "any statements the Defendant made after he was touched by the Detective[.]" (*Id*. at 13). In support of its decision to suppress the post-touching statements, the trial court reasoned:

Approximately three (3) significant things occurred after about ten to fifteen (10-15) minutes of discussion. First, the Defendant was confronted with the assertion that other subjects had made statements about what had occurred. Second, the Defendant was advised that the police had possession of a firearm that was, apparently, used in the purported crime and that there would be DNA on this firearm. Then, the Defendant was advised that because he had provided a DNA sample his DNA would be found on the weapon that the police had. Third, the

Detectives attempted to empathize with the Defendant by indicating that they could understand why the Defendant might do something of an improperly aggressive nature when encouraged by Carlos McGary who was a conceitedly (sic) dangerous individual. After the indications were made, the Defendant grudgingly conceded certain incriminating facts about his activity on Salem Avenue where an apparent armed robbery had occurred. However, the Defendant did not disclose all that the Detectives felt he should about the activities.

Approximately twenty to twenty five (20-25) minutes into the interview, the Detective made contact with the Defendant's body. The Detective, who was very close in physical proximity to the Defendant, approximately three (3) feet, patted or touched the Defendant two times on his (Defendant's) left leg. It was not an aggressive or particularly offensive touching. It was a touching that the parent might give a child in an affirming type way or encouraging type way, but it was not invited by the Defendant.

The court is very concerned about the voluntariness of the Defendant's statements after this point. As indicated herein whether or not this Defendant was making voluntary statements on June 01 is a very close call. The court felt that the factors indicating voluntary and knowing statements outweighed the factors negating voluntary and knowing statements. At the point the Defendant is touched on June 03, 2011 the court feels that the circumstances negating a voluntary and knowing confession outweigh the factors in favor of a knowing and voluntary statement.

By 8:10 p.m. or so on June 03, 2011 the Defendant had been in questioning a total of an hour and twenty minutes over a period of three (3) days. Of course, the Defendant was not in continuous custody. The following factors indicate that the Defendant's will was overborne and his capacity for self determination was critically impaired because of coercive police conduct. Defendant is a minor. Defendant is illiterate or reading far below the level he should be given his age. Defendant failed to complete school. The Defendant is an eighth (8th) grade drop out. The Defendant has been confronted with an assertion that there is overwhelming evidence against him. The Defendant has been subject to an emotional appeal that he may be the only one who is not confessing. There was an implied promise that if the Defendant were to speak his treatment, in terms of charges and sanctions, would be less severe than the other subjects. The Detectives attempted to empathize with the Defendant in relation to his having to deal with the dangerous Carlos McGary. Then, the Defendant was touched by the Detective. The court is of the view that the combination of all of these factors made it impossible for the Defendant to voluntarily speak.

The Defendant was told that a firearm was found and was in the possession of the police. The Defendant was told that the police had his DNA. The Defendant was told that his DNA was probably on the firearm or the police were likely to get evidence that would put his DNA on the firearm. The statements were only partially true at the time. It is probably likely that there would have been a test and

it is certainly conceivable that Defendant's DNA could have been matched to the firearm, but at the time the statement was made to the Defendant all the activity had not occurred. The impression was certainly left with the Defendant that this was an issue that was decided and it was unfavorable to the Defendant.

The Defendant was not advised that promises or coercion could be inferential or subtle. He was not advised promises or coercion could involve intangible benefits such as fewer charges or less severe punishment. The court is not inferring that police officers have to take affirmative steps to advise regarding this type of promise, but if an explanation of a promise or coercion is made it should be comprehensive and thorough and consistent with what police may be doing.

The factors in favor of an involuntary and unknowing confession outweigh the factors in favor of a knowing and voluntary confession at the point in this encounter just after Detective Gaier made physical contact with the Defendant. Therefore, any statements the Defendant made after he was touched by the Detective should not be admitted.

* * *

In the case at bar, about twenty (20) minutes into the interview on June 03 2011 the facts and circumstance[s] indicate here that the Defendant is a minor, he has difficulty reading and has only completed eight (8) years of school. He has some prior criminal experience in the juvenile court system. The Defendant had been interviewed on two (2) separate occasions, the first time for an hour and the

second time for twenty (20) minutes. No guardian is present. The Defendant is in a small room with two (2) Detectives and one Detective is in very close proximity to him. The Defendant has not been physically deprived or mistreated. He has been provided with water and restroom breaks. Defendant has not received any express promises or express threats. There have been implied promises and implied threats. The implied promise is that the Defendant would receive more favorable treatment because he is telling the truth and he would likely be implicated because of the statements of the other subjects. Defendant had been told he was "not snitching he was saving his ass." The clear implication there is that he better talk or the Detectives may believe the other subjects who are implicating him. Further, the Defendant has been told that, essentially, there is overwhelming evidence against him because of other statements and because there is the more objective evidence of DNA on the firearm.

The court is of the view that this is coercive police conduct. The court is not saying that the officers made any expressly deceptive or untruthful representations, but they made representations that were sufficient to overbear the will of the Defendant.

(*Id*. at 11-14).

**{¶ 5}** On appeal, the State contends the trial court erred in suppressing all statements Strickland made during the June 3, 2011 interview after Detective Gaier touched him. Specifically, the State challenges that trial court's finding that those statements were involuntary under the Fifth Amendment.

{¶ 6}    In ruling on a motion to suppress, a trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." (Citation omitted). *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). As a result, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 7}    With one exception, the record generally supports the trial court's factual findings regarding Strickland's two interviews. The exception concerns the trial court's finding that police were not entirely honest with Strickland about his DNA being on a firearm. Our review of a recording of the June 3, 2011 interview reveals that Detective Gaier told Strickland police had his DNA, his DNA had been sent to the crime lab, and police had the firearm. In addition to these true statements, the detective opined that Strickland's DNA would be found on the firearm. Neither detective told Strickland that lab testing already had confirmed the presence of his DNA on the firearm. Instead, Detective Gaier simply predicted to Strickland, "Your DNA's gonna be on that gun. * * * Your DNA's gonna be there." We see no lack of honesty or candor with regard to the DNA issue. We accept the remainder of the trial court's factual findings, which are supported by video recordings of the two interviews.[3]

---

[3] Although this court has reviewed both videos, our analysis will focus on the June 3, 2011 interview because the trial court only found suppression required with regard to statements made during that interview.

{¶ 8} The critical issue on appeal is whether the trial court's factual findings support its legal conclusion that Strickland's June 3, 2011 statements became involuntary after Detective Gaier touched him. Although the trial court provided a comprehensive and thoughtful analysis of that issue, we ultimately disagree with its conclusion. Because our standard of review concerning whether the facts found by the trial court legally justify suppression is de novo, we therefore must reverse. *See State v. Hughes*, 2d Dist. Montgomery No. 25152, 2013-Ohio-808, ¶14 (applying de novo review to determine whether the facts found by the trial court justified suppression of the evidence); *ABN AMRO Mtge. Group, Inc. v. Evans*, 8th Dist. Cuyahoga No. 98777, 2013-Ohio-1557, ¶13 (recognizing that "a *de novo* standard of review requires reversal if a reviewing court disagrees with the decision of law reached by the lower court").

{¶ 9} "The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶19. "A suspect may waive his constitutional right against self-incrimination, provided that waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." (Citations omitted). *Id.* at ¶20.

{¶ 10} "The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings, are analytically separate issues." (Citations omitted). *Id*. at ¶21. "The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." (Citations omitted). *Id.* "This due

process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Id.* "Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." (Citation omitted). *Id.*

{¶ 11}  "[A] confession may be involuntary and subject to exclusion if on the totality of the circumstances the defendant's will was overborne by the circumstances surrounding the giving of that confession." (Citation omitted). *Id.* at ¶22. "If all of the attendant circumstances indicate that the confession was coerced or compelled, it cannot be used to convict the defendant. That determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing." *Id.*

{¶ 12}  With the foregoing standards in mind, we hold that all of Strickland's statements during the June 3, 2011 interview were voluntary, including the statements made after Detective Gaier touched him. In reaching this conclusion, we are mindful of Strickland's youth and limited education. Indeed, these factors are perhaps the strongest ones militating against a finding of voluntariness. The record reflects that Strickland was sixteen and one-half years old at the time of his interview. As the trial court noted, he had an eighth-grade education and had trouble reading.

{¶ 13}  Strickland had some prior experience, however, with the juvenile-justice system. He also was advised orally of his *Miranda* rights, acknowledged understanding them, and agreed to waive them. Our review of the interview reveals that he had no difficulty interacting with the detectives and no apparent mental deficiencies. He also had no apparent problem understanding the purpose of the interview, the nature of the charges, or the questions being asked. The June 3,

2011 interview was not particularly lengthy or intense. It came two days after the first interview, which also was not particularly lengthy or intense. Both interviews took place in a typical police interview room, and the tone was largely conversational with some confrontational moments. Although Strickland's guardian was not in the room during the June 3, 2011 interview, she gave her consent for the detectives to question him. The trial court correctly noted the absence of any physical deprivation or mistreatment of Strickland during the interview.

{¶ 14} As set forth above, the trial court stressed "three significant things" that occurred part way through the June 3, 2011 interview: (1) the detectives told Strickland other people had given statements to them; (2) they claimed his DNA would be on a firearm used in the crimes; and (3) they attempted to empathize with him. Although these facts are relevant under a totality-of-the-circumstances analysis, we find them insufficient, when considered in conjunction with all surrounding facts and circumstances, to render Strickland's statements involuntary.

{¶ 15} Regardless of whether other people actually had given statements, these types of claims by police routinely are permitted by reviewing courts. *See*, *e.g.*, *State v. Hopkins*, 2d Dist. Montgomery No. 24940, 2012-Ohio-5536, ¶34 ("As for Hopkins' claim about lies, police did falsely tell him Jeffrey had admitted possessing a gun and having sex with J.R. But these misrepresentations about the evidence did not render Hopkins' statements involuntary under the totality of the circumstances."). With regard to the DNA issue, Detective Gaier truthfully pointed out to Strickland that police had both his DNA and a firearm used in the crimes. He truthfully told Strickland that his DNA had been sent to the crime lab and predicted that it would be found on the firearm. Specifically, Detective Gaier told Strickland, "Your DNA's gonna be on that gun.

\* \* \* Your DNA's gonna be there." We see nothing inappropriate about these statements.[4] We also see nothing unusual or improper about the detectives' efforts to empathize with Strickland by telling him they understood why he might have committed the crimes. Whether sincere or feigned, such routine expressions of empathy do not render a confession involuntary. *Compare State v. Powell*, 1st Dist. Cal. App. No. A131100, 2012 WL 5193833, \*4 (Oct. 22, 2012) (finding no improper coercion where interviewing officer "came across more like a mentor than a police officer during the interview"); *Ortiz v. Uribe*, 671 F.3d 863, 870 (9th Cir. 2011) (concluding that "empathic and parental questioning does not render a confession involuntary").

{¶ 16} In its suppression ruling, the trial court also expressed concern about Detective Gaier's act of touching Strickland's leg. The trial court viewed this touching as the tipping point in the voluntariness equation. Indeed, for the trial court to rule that statements after, but not before, the touching of the knee should be suppressed the court must have concluded that the touching contributed to and added to whatever coercive effects existed before that point. We have found no Ohio case law addressing the effect of such touching on the voluntariness of a defendant's statements, and the trial court cited none. We are unpersuaded that Detective Gaier's act of patting Strickland's leg added any coercive component or otherwise rendered Strickland's subsequent statements involuntary under the Fifth Amendment. *Compare Powell*, at \*4 (finding no improper coercion even though the interviewing officer "touched [the defendant] gently on the

---

[4]Even if Detective Gaier had lied about Strickland's DNA being found on the firearm, reviewing courts routinely allow such conduct by investigators. "Use of deceit by the interrogating police officers and misrepresentations made to the suspect about the evidence police possess do not per se render a confession involuntary. Rather, deceit or a misrepresentation about the evidence is but one factor bearing on voluntariness." *State v. Reeves*, 2d Dist. Greene No. 2002-CA-9, 2002-Ohio-4810, ¶8.

leg and shoulder and said he was a good person who never intended for someone to die").[5] We have viewed the recording of the interview which reveals that Detective Gaier quickly and lightly patted Strickland on the leg when Strickland placed his head in his hands. "It was not an aggressive or particularly offensive touching. It was a touching that the parent might give a child in an affirming type way or encouraging type way[.]" (Doc. #28 at 12) In our specific view of the interview, this touching was not in any way a coercive gesture. When viewed in conjunction with the other facts and circumstances, the pat on the knee did not create, or add to, a coercive environment that would make all subsequent statements by Strickland involuntary.

{¶ 17}   In its ruling below, the trial court also found that the detectives had made implied promises and threats to Strickland. Specifically, the trial court found an implied promise "that the Defendant would receive more favorable treatment because he is telling the truth and he would likely be implicated because of the statements of the other subjects." (Doc. #28 at 14). The implied threat apparently was that "he better talk or the Detectives may believe the other subjects who are implicating him." (*Id*.).

{¶ 18}   Having reviewed the June 3, 2011 interview, we find no impermissible threats or promises that contributed to Strickland's free will being overborne. Detective Gaier admonished Strickland to tell the "full truth," suggested that he was not telling everything, and advised him that the interview was his chance to talk. Detective Gaier also told him the detectives understood people make mistakes, they knew he feared co-defendant Carlos McGary, and they knew he had participated in the robbery.  Detective Gaier suggested that Strickland not "dig [himself] in a

---

[5]We note that *Westlaw's* on-line version of *Powell* contains a notation indicating that California rules of court restrict the citation of "unpublished opinions" in that state's courts. California's rules of court obviously have no impact on our ability to cite *Powell* as persuasive authority.

hole" by lying. Detective Gaier also suggested that he not "bury himself." Detective Gaier told him that if he had made a "bad choice," he needed to clear it up. Detective Gaier added that other co-defendants had talked, and he suggested that Strickland had been implicated.

{¶ 19} This court has recognized that "admonitions to tell the truth are considered neither threats nor promises and are permissible." *State v. Stringham*, 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, ¶16. "Similarly, assurances that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate a confession." *Id.* Even a "suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive, as people 'convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities.'" *Id.*, quoting *State v. Farley*, 2d Dist. Miami No.2002-CA-2, 2002-Ohio-6192; *see also State v. Bailey*, 2d Dist. Miami No. 94 CA 39, 1995 WL137019, *7 (March 31, 1995) (finding a statement that the defendant "could help himself" by speaking with investigators not impermissibly coercive because "the advice was non-specific as to how making a statement would be advantageous").

{¶ 20} Here Detective Gaier urged Strickland to tell the truth and suggested that it would be better for him to talk because his co-defendants were talking. We see no implied promise of any particular benefit and no implied threat of any particular harm if Strickland refused to cooperate. Detective Gaier was entitled to "create a favorable environment for a confession," *Stringham* at ¶16, and his statements to Strickland during the June 3, 2011 interview fall short of the type of threats or promises that render a confession involuntary.[6]

---

[6] Parenthetically, we also find no impermissible threats or promises made to Strickland during the June 1, 2011 interview. In its ruling, the trial court found an implied promise that Strickland would face less severe charges or would receive less severe punishment if he talked. We find no such promise (or threat) with regard to the charges or punishment Strickland might face. At one point during the June 1,

{¶ 21} Finally, we note the trial court's concern that Detective Gaier provided only a basic explanation of the terms "promise" and "coercion" when obtaining Strickland's *Miranda* waiver. The trial court pointed out that the detective "did not define promise as encompassing both tangible and intangible benefits, such as receiving favorable treatment with respect to charges or punishment for the underlying activity." (Doc. #28 at 11). Later in its ruling, the trial court observed:

> The Defendant was not advised that promises or coercion could be inferential or subtle. He was not advised promises or coercion could involve intangible benefits such as fewer charges or less severe punishment. The court is not inferring that police officers have to take affirmative steps to advise regarding this type of promise, but if an explanation of a promise or coercion is made it should be comprehensive and thorough and consistent with what the police may be doing.

(*Id*. at 13).

{¶ 22} We are unpersuaded that Detective Gaier's failure to provide a more comprehensive definition of the terms "promise" and "coercion" in the context of obtaining a *Miranda* waiver affected the rendition of the waiver or the voluntariness of Strickland's subsequent statements. Regardless of how expansively the terms "promise" and "coercion" might

---

2011 interview, Strickland said he did not want to go to jail for what a co-defendant did. In response, the detectives stated, "That's why you need to tell us the full truth." They also advised him that telling the truth was not "snitching." They described it as "saving your ass." At other points, the detectives admonished Strickland not to "minimize what happened" and told him the co-defendants would not hesitate to pin the crime on him. The detectives additionally told Strickland that if he had overheard the co-defendants planning or discussing the crime, the detectives could "get around" or "deal with" "that kind of stuff." But the detectives neither explicitly nor implicitly promised Strickland reduced charges or less severe punishment if he talked.

be interpreted, or how comprehensively they could be explained, the record reveals no evidence whatsoever of any "promise" or "coercion" exerted on Strickland to induce him to waive his *Miranda* rights and agree to speak to the detectives.

{¶ 23} As for the interview that followed, we are unpersuaded that the detectives had an obligation to tell Strickland promises or coercion could be inferential or subtle. The issue before us is whether the detectives coerced a confession through impermissible threats or promises, not whether they advised Strickland to be on the lookout for inferential or subtle coercion. Based on the reasoning set forth above, we find no impermissibly coercive police conduct to render Strickland's statements involuntary under the Fifth Amendment. Accordingly, the trial court erred in sustaining in part Strickland's suppression motion.

{¶ 24} The State's assignment of error is sustained. The judgment of the Montgomery County Common Pleas Court is reversed, and the cause is remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN and WELBAUM, JJ., concur.

Copies mailed to:

Mathias H. Heck
R. Lynn Nothstine
Anthony Cicero
Timothy N. O'Connell