**[Cite as *State v. Thomas*, 2014-Ohio-5262.]**

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                   :          C.A. CASE NO.    26123

v.                                               :          T.C. NO.    13CR171/2

CHANCE THOMAS                                    :          (Criminal appeal from
                                                   Common Pleas Court)

    Defendant-Appellant                  :

                                                 :

. . . . . . . . . .

# O P I N I O N

Rendered on the _____26th_____ day of _____November_____, 2014.

. . . . . . . . . .

TIFFANY C. ALLEN, Atty. Reg. No. 0089369, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

LORI R. CICERO, Atty. Reg. No. 0079508, 500 East Fifth Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Chance Thomas, filed March 11, 2014.  Thomas appeals from his February 4, 2014 judgment entry of conviction, asserting that the trial court erred in overruling his motion to suppress and in imposing a four-year sentence for felonious assault (serious harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree.  We hereby affirm the judgment of the trial court.

{¶ 2}   We note that Thomas was initially charged by way of complaint on January 14, 2013, on one count of felonious assault in Miamisburg Municipal Court.  Thomas was subsequently indicted on February 28, 2013, along with Emad Addin M. Saleh, in the Montgomery County Court of Common Pleas, on one count of aggravated robbery (serious harm), a felony of the first degree.   Thomas entered a plea of not guilty on March 14, 2013.  On March 15, 2013, a "Reindictment 'B'" was issued charging Thomas, Saleh, and Wesley J. Qualls Jr. each with one count of felonious assault, and charging Saleh and Thomas with one count of aggravated robbery.  The "Reindictment "B'" also charged Qualls with one count of robbery.  The victim herein is William Jeffrey Schwarz.  On March 18, 2013, Thomas pled not guilty to the reindicted charges, and on April 2, 2013, he filed his motion to suppress.  On April 30, 2013, the court issued an entry providing that "a nolle prosequi without prejudice is entered by order of the court" to the February 28, 2013 indictment.

{¶ 3}   The court held a hearing on the motions to suppress of both Thomas and Saleh on May 16, 2013.  Detective Mark Allison testified that he is a 33 year veteran with the West Carrollton Police Department. He testified that he participated in the investigation

of a robbery and assault complaint that was made on November 26, 2012 by Schwarz. Allison stated that the offenses occurred at the rear parking lot of Leisure Lawn on Liberty Lane in West Carrollton. Allison testified that in the course of his investigation, he identified Thomas and Saleh as individuals involved in the offenses. Allison stated that he interviewed Thomas on January 4, 2013, at Miamisburg High School, having learned from a school resource officer that Thomas was there. Allison stated that he met with Thomas at approximately 10:00 a.m. According to Allison, Thomas was not handcuffed when he was brought to a conference room in the high school, and he was not under arrest. Allison stated that Thomas did not appear to be under the influence of alcohol or drugs, and that Thomas understood the purpose of the interview. Allison stated that he explained Thomas' constitutional rights to him from a standard printed form maintained by the West Carrollton Police Department. Allison identified a copy of the form he used when he interviewed Thomas. Allison testified as follows regarding the form:

> I showed it to him, filled in the information at the top, and I read, like, "Your rights. Before asking any questions you must understand your rights." And I went through the five rights. I went through the first one. I asked him verbally if he understood. If you understood, I need a verbal yes. We did that same protocol for all five. I then read and showed him the waiver of rights which he stated he understood and then how many years of schooling he has completed up to that point. He put 11 in and I said, "If you want to talk, talk to me. Just sign this line." And I signed it and I believe Ryan Copsey witnessed it.

{¶ 4} Allison stated that he did not promise Thomas anything in exchange for his signature, and that he did not threaten Thomas if he refused to sign the form. According to Allison, Thomas did not ask any questions about the form, nor did he request the assistance of an attorney. After Thomas agreed to speak to him, Allison testified that he interviewed him about the incident involving Schwartz. Allison stated that Thomas did not ask to stop the questioning in the course of the interview. Allison testified that at no time did Thomas exhibit reluctance in answering questions. According to Allison, Thomas agreed to write a statement, and Allison identified a copy of Thomas' written statement in court, which he testified included questions and answers. Allison denied that Thomas ever asked any questions or requested the assistance of an attorney while writing his statement. When asked what Thomas did at the end of the interview, Allison responded, "As far as I know, he went back to school. He was free to do whatever he wanted to do." Allison stated that at the end of the interview, he did not arrest Thomas or take him into custody.

{¶ 5} On cross-examination, Allison testified that the school resource officer who contacted him about Thomas' location is also a Miamisburg police officer who works in Miamisburg High School. Allison stated that Allison "contacted him probably in previous days letting him know I'm looking for this guy, didn't know if he was in school or not and he told me if he shows up he'd contact me." Allison stated that when he arrived at the school, Thomas was taken out of class and initially brought to the principal's office to meet him, and that the school resource officer then accompanied them to the conference room and was present during the interview. The following exchange occurred:

Q. And the first thing you did was read his Miranda rights?

A. Yes.

Q. You didn't tell him why you were there?

A. I could have very well said, "I want to talk to you about Jeff Schwarz. I'm going to go over your rights first." It could have very well gone that way, but I couldn't tell you for sure.

Q. Well, do you remember what you told him when you - - what you told him you were there for?

A. Probably introduced myself and told him I wanted to talk about the incident with Jeff Schwarz.

Q. Said you probably introduced yourself?

A. Well, I'm sure he would have asked who I was and that's usually what I do is I introduce myself if I don't know him.

Q. And did he know what you were talking about when you said, "Jeff Schwarz?" Did he acknowledge that in any way?

A. He seemed to know exactly what I was talking about.

Q. Why do you say, "He seemed to know exactly?"

A. There's no denial, there's no surprised look, there's no - - he just kind of shook his head up and down and - -

* * *

Q. * * * And when you told him you were there about the Schwarz incident did you describe what the incident was or did you just use that term, "the Schwarz incident?"

A. I think he knew what it was already.

Q. Why do think that he knew?

A. I didn't ask any immediate questions about it. I explained to him I wanted to get his side of this thing and there's two sides to every story.

Q. Did you tell him that he was not in trouble and you weren't looking to arrest him?

A. I may have said I'm not looking to arrest him. I want to get the whole story.

\* \* \*

Q. But you wouldn't have told him that this was an incident of street justice you understood and he probably wasn't going to be in trouble?

A. I would have said something like I'd like to know what happened. There's two sides to every story and I'd like to get your version of this. Maybe there was some street justice. Maybe there was, I don't know, but I'd like to know what happened here.

Q. Did you tell him whether anybody had been charged at that point?

A. No, I don't think anyone had been.

Q. Did you tell him that he could possibly be charged?

A. I probably would have told him I'm not sure what's going to happen with this case. The Prosecutor would have the final determination.

Q. Again, you said you probably would have told him. You don't remember or recall?

A. I don't remember him asking a direct question about that. I think as we got ready to leave at the end he said if charges are put anywhere, please let me know. I remember that as we were leaving.

Q. When did you first learn that Thomas Chance (sic) was involved in this incident?

A. I'm not sure. It could have been a week or so afterwards. One of the officers was looking around Facebook and we could have had a possible ID on him at the time.

Q. How did you identify him?

* * *

A. The victim identified him.

* * *

Q. * * * Do you know how old Thomas Chance is?

A. I think 18 - - 19 - -

Q. How old was he at the time you interviewed him?

A. I believe he was 18. I'm not sure.

Q. How did you determine that?

A. Looked at his date of birth.

Q. Where did you see that?

A. Could have been in OHLEG, it could have been in school records. I'm not sure. It could have been a couple of places - -

Q. Did you look at his school records when you went there that day

to meet with him?

A. No, I did not.

Q. When did you look at his school records?

A. I don't remember ever looking at school records. Someone could have told me - -

Q. So it wasn't - -

A. - - his date of birth - -

Q. - - in his school records that you learned his date of birth.

A. Could have been on OHLEG. It could have been on driver's licenses.

Q. Was it before you interviewed him?

A. Most likely I would have looked at that before I interviewed him, yes.

Q. You don't know.

A. I would have known that before I interviewed him.

Q. Well, you're interviewing somebody at high school and how old are most people that are in high school?

A. I believe he - - I want to say for some reason I knew he was 18. I was probably looking at his driver's license records - -

Q. If he was not 18 would you have contacted his parents?

A. I think I went to his house first, anyways and didn't have any luck contacting him there. I left the card in the door. No one called me back. If

they're under 18, yes. We always make a - - effort to - - concentrated effort to contact their parents.

When asked if he advised Thomas that he was free to leave at any time in the course of the interview, Allison responded, "I don't know if I told him that or not when he came in."

{¶ 6}    In overruling Thomas' motion to suppress, the trial court determined in part as follows:

## I.  FACTS

Detective Allison went through a pre-interview form with each Defendant and followed the same procedure in each Defendant's interview. Defendant Saleh's pre-interview form was marked as State's Exhibit 1 and Defendant Thomas' pre-interview form was marked as State's Exhibit 3. The pre-interview form had two sections titled as follows:  (1) Your rights, and (2) Waiver of Rights.  Detective Allison testified that he went through each constitutional right listed on the form with each Defendant.

1.  You have the right to remain silent.  You do not have to make any statements or answer any questions.

2.  Anything you say can and will be used against you in a Court of Law.

3.  You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

4.  If you do not have the money to a hire a lawyer, a lawyer appointed by the Court, or a lawyer from the Public Defender's, will be

provided to you before and during questioning without any cost to you.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Detective Allison testified that after he read through each constitutional right he asked each Defendant whether they understood those rights. Detective Allison testified that each Defendant verbally affirmed that they understood each constitutional right. Further, each defendant signed their name on the signature line at [the] bottom of the waiver of rights section of the pre-interview form. Moreover, after the conclusion of each Defendant[']s interview, Detective Allison asked if they would be willing to write a written statement. Each Defendant indicated they were willing to do so and made written statements. Defendant Saleh's written statement was marked as State's Exhibit 2 and Defendant Thomas' written statement was marked as State's Exhibit 4.

## II. LAW AND ANALYSIS

\* \* \*

Here, Detective Allison properly advised each Defendant prior to their respective interviews of their Miranda rights. Detective Allison testified that each Defendant fully understood the rights they were waiving and that they were not under the influence of any drugs or alcohol. Further, Detective Allison testified that he made no threats or promises to any Defendant and

that neither Defendant ever asked for an attorney or refused to cooperate with him at any point during the interview process. Neither Defendant elicited any contrary testimony to support their argument that they were not properly Mirandized before the interview process began.

* * *

**{¶ 7}** On January 13, 2014, after a bench trial, the trial court issued a Decision and Verdict that provides in part as follows:

At the outset, the parties stipulated that "serious physical harm" to the person of William "Jeff" Schwarz as to Felonious Assault * * * has been established beyond a reasonable doubt. * * * The following facts are relevant for purposes of this Decision and Verdict.

On November 26, 2012, Jeff Schwarz received a phone call from Phil Ochen (now deceased) and they made plans to "hang out." At approximately noon that day, Mr. Ochen arrived at Mr. Schwarz's residence in a car being driven by Co-Defendant Wesley Qualls and an unknown passenger.[1] After Mr. Schwarz entered the vehicle, Mr. Qualls drove around until they arrived and parked at the Leisure Lawn parking lot in West Carrol[l]ton, Ohio. Shortly after the first car arrived, another vehicle arrived and parked in front of the vehicle being driven by Mr. Qualls. Riding in that second vehicle were Emad Saleh, Dorian Barnhardt, and Defendant, Chance Thomas. All

---

[1] The trial court indicated as follows in a footnote: "At trial there was discrepancy as to whether a third person was in the passenger seat. However, for purposes of this Decision and Verdict, that fact is immaterial."

three exited the vehicle and approached the vehicle Mr. Schwarz was sitting in. Once Mr. Schwarz's door was opened, it was uncontroverted that Mr. Barnhardt threw the first punch hitting Mr. Schwarz. The three men, including Defendant, continued to punch and kick Mr. Schwarz and left him lying on the ground with severe injuries including a broken leg. * * *

* * *

In the current case, Defendant was a ready and willing participant in ambushing the victim, Jeff Schwarz. Defendant testified that he knew that he was going to the Leisure lawn parking lot to at the very least watch a fight between Emad Saleh and Jeff Schwarz. At trial, Defendant testified that he was an active participant in the attack and punched Mr. Schwarz a minimum of three times, landing his punches to Mr. Schwarz's head. The evidence established beyond a reasonable doubt that Defendant acted in complicity with Mr. Saleh and Mr. Barnhardt in attacking the victim. The parties have stipulated that Mr. Schwarz endured serious physical harm.

Moreover, the Court finds any claim that Defendant was struck first by Mr. Schwarz and that he acted in self-defense is neither credible nor supported by the evidence heard at trial.

As such, the Court finds Defendant guilty beyond a reasonable doubt of Felonious Assault in violation of O.R.C. 2903.11(A)(1).

{¶ 8} Regarding sentencing, the court indicated as follows at disposition:

And, Barry, I should say I haven't had - - I have had the opportunity,

and I have taken advantage of the opportunity to review your presentence statement and recommendation. It was very tho[r]ough. It was very helpful. I have reviewed a lot of materials from people supporting Mr. Thomas. I reviewed, sir, your letter, which I found in many ways compelling. * * * I want everybody to know I have reviewed that material.

* * *

I should indicate that I have reviewed a written victim impact statement in this case. Let me explain why I'm going to impose the sentence I'm going to impose. These are the factors, pro and con, relative to Mr. Thomas that I feel I must consider, and I have considered in making my decision.

As I said, in a previous sentencing of Mr. Qualls, this is a very sad case. Some facts that are important to my decision are the following: Mr. Thomas is 19 years old. He's a young man. He's embarking on his life. He just graduated from Miamisburg High School this past June. He has no other felony convictions. He lives with his fiancee and parents, and they are expecting their first child. I'm mindful of the risk of sending a young person to prison. That's something I have wrestled with in this case, as I did in the case of Mr. Qualls.

On the other side of the case, the State is requesting a six-year prison sentence, if I heard correctly, due to the severity of the incident. The victim is requesting the maximum sentence of eight years. The Defendant, as I

determined at the trial to the Court, was an active participant in what I consider to be an ambush. Mr. Schwarz was ambushed by a number o[f] people, and he was beaten severely. He was knocked to the ground where he was stomped by [these] attackers. He was beaten to the point that his leg was broken, which required the surgical insertion of a plate and screws, which he will carry for the rest of his life. The victim was left by Mr. Thomas and others laying in a business parking lot. Where he lay for over 25 minutes until an employee of that business, a driver, happened to pull in the parking lot and see him, and that's when he was able to get some help.

At his trial Mr. Thomas attempted, in my view, to minimize his responsibility for the assault. By law the level of this offense results in a presumption that a prison sentence should be imposed. That's what the law tells me. I have received and reviewed Mr. Galen's excellent sentencing statement, as well as Mr. Thomas's letter, and his other letters of support. And let me say, Mr. Thomas, I was struck by several comments that you made, and in particular this comment of your letter, "I still have high expectations for myself, Your Honor. I plan on going back to college and getting a degree in business management and maybe even open my own business one day." I encourage you to follow through on that despite the sentence that I impose in this case. I think that's a very laudable goal. You appear to me, from the materials I reviewed, to be a talented young man.

I've got a letter from Mr. Pittroff [phonetic], one of your teachers at

Miamisburg High School, who tells me that Chance - - and I'm quoting,

"Chance passed the State mandated sophomore OGT

Ohio Graduation Test, the first time with the highest level of

achievement, advanced. His score was one [of] the highest in

all four of my sophomore classes that year."

You have talent. You have ambition to do something good with your

life.

The recommendations contained in the presentence investigation are

for - - community control sanctions, as Mr. Galen said. However, I

previously sentenced another defendant in this case, Mr. Qualls, who I

believe had less culpability to a prison term of three years. Wesley Qualls is

serving a three-year sentence, and I think of the three people who have been

before this Court, he is the least culpable. In good conscience I cannot agree

with a recommendation for community control sanctions, given the severity

of the beating. I simply can't go that route.

Accordingly, in Case Number 2013CR171, the Court imposes a

sentence of four years CRC. * * *

The court further ordered Thomas to "pay restitution to William Schwarz on a joint-and-several basis with the other individuals convicted of his assault in the amount of $6,612.17."

{¶ 9}    Thomas asserts two assignments of error herein. His first assigned error is as follows:

THE VERDICT SHOULD BE REVERSED BECAUSE THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS WHICH WERE OBTAINED IN VIOLATION OF HIS RIGHTS GUARANTEED BY THE DUE PROCESS CLAUSES OF FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS TEN AND FOURTEEN OF THE CONSTITUTION OF OHIO.

{¶ 10} According to Thomas' brief, "[a]ll statements made by Mr. Thomas are inadmissible because Detective Allison conducted custodial interrogations of Mr. Thomas in violation of the Fifth and Sixth Amendments, and *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602." Thomas further asserts that the "totality of the circumstances in this case reveals that there was no effective waiver by Mr. Thomas." Thomas asserts that he "experienced compulsion and coercion, which could not possibly render his statement, let alone a waiver, voluntary." Thomas further asserts as follows:

Detective Allison knew that Mr. Thomas was a high school student. It is unclear from a review of [the] transcript of the motion to suppress if or how Detective Allison knew Mr. Thomas was at least 18 years of age. It is also unclear whether or not Detective Allison made any attempt to involve Mr. Thomas' parents in the interrogation. It is however clear that Mr. Thomas was removed from class, told he would be interviewed by a Detective and placed into a conference room to be interrogated. Detective Allison did not even recall if he ever told Mr. Thomas that he was free to

leave at any time. This scenario is to say the least intimidating for most adults, let alone a high school student.

**{¶ 11}** As this Court has previously noted:

In regard to a motion to suppress, " 'the trial court assumes the role of the trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' " *State v. Hopfer* (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* Montgomery App. No. 20662, 2005-Ohio-3733, 2005 WL 1707019, citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

*State v. Hoskins,* 197 Ohio App.3d 635, 2012-Ohio-25, 968 N.E.2d 544, ¶ 11 (2d Dist.).

**{¶ 12}** This Court has further previously noted as follows:

"The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19. "A suspect may waive his constitutional right against self-incrimination, provided that

waiver is voluntary. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." (Citations omitted). *Id*. at ¶ 20.

"The issues of whether a confession is voluntary, and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings, are analytically separate issues." (Citations omitted). *Id*. at ¶ 21. "The due process clause continues to require an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." (Citations omitted). *Id.* "This due process test takes into consideration the totality of all the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Id*. "Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." (Citation omitted). *Id*.

"[A] confession may be involuntary and subject to exclusion if on the totality of the circumstances the defendant's will was overborne by the circumstances surrounding the giving of that confession." (Citation omitted). *Id*. at ¶ 22. "If all of the attendant circumstances indicate that the confession was coerced or compelled, it cannot be used to convict the defendant. That

determination depends upon a weighing of the pressure to confess against the power of resistance of the person confessing." *Id*.

*State v. Strickland*, 2d Dist. Montgomery No. 25545, 2013-Ohio-2768, ¶ 9-11.

**{¶ 13}** Finally, as this Court has previously noted:

 * * * "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witnesses." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997); *see State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992) ("At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact.").

*State v. Perkins*, 2d Dist. Miami No. 2011-CA-24, 2012-Ohio-2544, ¶ 13.

**{¶ 14}** Allison, with 33 years of law enforcement experience, testified that he carefully explained each of the rights listed on the pre-interview form maintained by the police department to Thomas, as set forth in the decision of the trial court, and that he ascertained Thomas' understanding of each right prior to the interview. The trial court credited Allison's testimony regarding the process by which Thomas was *Mirandized*, namely in the absence of compulsion and coercion, and we defer to the trial court's assessment of credibility. There is nothing in the record to suggest that Thomas, an adult, was not free to terminate the interview nor that he was prohibited from leaving the conference room. Allison testified that he did not make promises or issue threats in exchange for Thomas' waiver of his rights. Allison testified that Thomas did not appear to be under

the influence of alcohol or drugs, and that he understood the purpose of the interview. Thomas did not request an attorney, exhibit any reluctance to answer questions, ask any questions himself, or ask to stop the interview. On cross-examination, Allison testified that Thomas did not deny knowledge of an incident involving Schwarz or exhibit surprise when Allison told him that he wanted to speak to him about Schwarz. Although Allison could not recall exactly how he confirmed Thomas' age, he testified that he did so prior to the interview, and that Thomas was 18 or 19 at the time. He stated that he initially went to Thomas' home and was unable to make contact with anyone there. In the event that any suspect is under the age of 18, Allison testified that officers "always make a * * * concentrated effort to contact their parents."

{¶ 15} Having thoroughly reviewed the record, and deferring to the trial court's assessment of credibility, we find that the trial court's factual findings are supported by competent, credible evidence in the record, and that the applicable legal standard is satisfied. Accordingly, Thomas' first assigned error is overruled.

{¶ 16} Thomas' second assigned error is as follows:

APPELLANT SHOULD BE REMANDED TO THE TRIAL COURT FOR SENTENCING AS THE SENTENCE HE RECEIVED IS CONTRARY TO LAW AND IN VIOLATION OF HIS RIGHTS UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 17} Thomas asserts as follows:

* * * If the relevant factors indicate anything, it is that a four-year prison sentence is contrary to law. There are nine (9) potential factors set

forth in R.C. 2929.12(B) that are designed to indicate to the Court that the offender's conduct is "more serious" than conduct normally constituting the offense of conviction. Serious physical harm is an element of the offense of which Mr. Thomas was convicted. At first glance, this factor would seem to apply while none of the other "more serious" factors apply. However, it is logically impossible for an element of an offense to also make that conduct constituting the offense more serious than other conduct normally constituting the offense. The normal conduct of this offense will always include serious physical harm. Accordingly, the conduct of Mr. Thomas' conviction is no more serious than conduct normally constituting the offense.

Contrary to the nine (9) factors that can make offense conduct (sic) "more serious", the law only sets forth four (4) factors that would indicate the offense conduct is "less serious" than conduct normally constituting the offense. R.C. § 2929.12(C). The fact that Mr. Thomas did not expect to cause physical harm should be considered under R.C. § 2929.12(C)(3).

Finally, the law sets forth five (5) factors that would indicate recidivism is likely, and five (5) factors that would indicate recidivism is not likely. R.C. 2929.12(D) and (E). A court is also obliged to consider any non-listed relevant factor as well. On balance, nothing the court should have considered would warrant a four-year prison sentence. In fact, the probation department recommended Community Control Sanctions as an appropriate sentence for Mr. Thomas. * * * The probation department made their

recommendation of Community Control Sanctions having the benefit of reviewing the victim impact statement. * * * Additionally, as the Court indicated, Mr. Thomas was 19 years of age at the time of sentencing. * * * He had no previous felony convictions. * * * As the Court noted after reviewing materials for sentencing, Mr. Thomas appeared to be a talented young man who has ambition to do something with his life.

{¶ 18}　Thomas notes that "most appellate courts consider the two-step approach set forth by the Supreme Court in *State v. Kalish*, 120 Ohio St.3d 23, 896 N.E.2d 124 (2008) to be no longer applicable to the current sentencing statutes."

{¶ 19}　This Court recently noted as follows:

* * * Pursuant to *Kalish*, a felony sentence is reviewed using a two-step process: the first step involves determining whether the sentence is contrary to law, i.e. whether the trial court complied with all applicable rules and statutes, and the second step involves determining whether the trial court abused its discretion. A panel of this court recently decided *State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 (2d Dist.), which held that *Kalish*'s two-step approach no longer applies to appellate review of felony sentences and adopted the standard of review found in R.C. 2953.08(G)(2). *Rodeffer* at ¶ 29.

Under this statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, *only*, if it "clearly and convincingly" finds either (1) that the record does not support

certain specified findings or (2) that the sentence imposed is contrary to law. *Rodeffer* stated that "[a]lthough *Kalish* no longer provides the framework for reviewing felony sentences, it does provide * * * adequate guidance for determining whether a sentence is clearly and convincingly contrary to law. * * * According to *Kalish*, a sentence is not contrary to law when the trial court imposes a sentence within the statutory range, after expressly stating that it had considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the factors in R.C. 2929.12." (Citations omitted). *Id.* at ¶ 32.

*State v. Green*, 2d Dist. Clark No. 2012 CA 64, 2014-Ohio-2305, ¶ 7-8.

**{¶ 20}** R.C. 2929.11 provides as follows:

(A) A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(B) A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division

(A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders.

(C) A court that imposes a sentence upon an offender for a felony shall not base the sentence upon the race, ethnic background, gender, or religion of the offender.

{¶ 21} As this Court noted in *State v. Carlton*, 2d Dist. Montgomery No. 26086, 2014-Ohio-3835, ¶ 11:

R.C. 2929.12(B) sets forth certain factors that, along with "any other relevant factors," a trial court "shall consider * * * as indicating that the offender's conduct is more serious than conduct normally constituting the offense." Division (C) of that same section sets forth certain factors that, along with "any other relevant factor," a trial court "shall consider * * * as indicating that the offender's conduct is less serious than conduct normally constituting the offense." Division (D) sets forth certain factors that, along with "any other relevant factors," a trial court "shall consider * * * as factors indicating that the offender is likely to commit future crimes." Finally, Division (E) sets forth certain factors that, along with "any other relevant factors," a trial court "shall consider * * * as factors indicating that the offender is not likely to commit future crimes."

{¶ 22} We initially note that Thomas' sentence is within the statutory range for a felony of the second degree; R.C. 2929.14(A)(2) provides that "[f]or a felony of the second

degree, the prison term shall be two, three, four, five, six, seven, or eight years." We further note that neither in the trial court's remarks at the sentencing hearing, nor in Thomas' judgment entry of conviction, is there any express indication that the trial court considered the purposes and principles of sentencing, or the seriousness and recidivism factors. R.C. 2929.11 and R.C. 2929.12 do not require findings on the record, however, and in *Carlton*, we noted that this Court has "held on more than one occasion that a trial court's consideration of the statutory sentencing factors may be presumed from a silent record." *Id*., ¶ 18.

**{¶ 23}** R.C. 2903.11 provides: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *." R.C. 2929.12(B)(2) lists the following factor as indicative that an offender's conduct is more serious than conduct normally constituting the offense: "The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense." The parties stipulated that Schwarz endured serious physical harm. We cannot agree with Thomas' assertion that his conduct in committing felonious assault is "no more serious than conduct normally constituting the offense" simply because serious physical harm is an element of R.C. 2903.11(A)(1) and also one factor indicating that an offender's conduct is more serious than conduct normally constituting the offense. It was significant to the trial court at sentencing that Thomas, in complicity with two others, actively participated in ambushing Schwarz, who was severely beaten. We note that Schwarz testified at trial that in the course of the attack, Thomas hit him four or five times from behind with a closed fist. When he fell to the ground, Schwarz testified that the three men "[h]it me all over my body, my back, my

face, and I could feel them jumping on my leg." Schwarz stated that he was in "[e]xcruciating pain" during the attack. It was also significant to the court that Schwarz's attackers left him alone in the parking lot after the attack. The court awarded restitution to Schwarz in the amount of $6,612.17 and noted that his condition after the incident involves permanent disfigurement that required "the surgical insertion of a plate and screws, which he will carry for the rest of his life." It was also significant to the court that at his trial, "Mr. Thomas attempted, in my view, to minimize his responsibility for the assault." While Thomas directs our attention to the factor set forth in R.C. 2929.12(C)(3), namely that "the offender did not cause or expect to cause physical harm," Thomas stipulated that he caused serious physical harm, and Thomas' active participation in the assault, as well as his conduct in leaving the scene while Schwarz lay severely injured in the parking lot, belie his assertion that he did not expect to cause physical harm.

{¶ 24} In addition to the above factors, the record reflects that in sentencing Thomas, the court considered the "risk of sending a young person to prison." The court gave thoughtful consideration to correspondence from Thomas, in which he asserted that he planned to continue his education and "open my own business one day," as well as correspondence from Thomas' high school teacher in support of Thomas. The court noted that Thomas did not have a felony conviction in his record. Finally, while the Adult Probation Department recommended community control sanctions, the trial court correctly noted that Thomas' offense "results in a presumption that a prison sentence should be imposed," consistent with R.C. 2929.13(D)(1), which provides that "* * * for a felony of the * * * second degree, * * * it is presumed that a prison term is necessary in order to

comply with the purposes and principles of sentencing under section 2929.11 of the Revised Code."

**{¶ 25}** For the foregoing reasons, we find nothing in the record herein to rebut the presumption that the trial court considered the purposes and principles of sentencing, and the seriousness and recidivism factors, in sentencing Thomas. In other words, Thomas' sentence is supported by the record, is not contrary to law, and does not demonstrate an abuse of discretion. Accordingly, Thomas' second assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and WELBAUM, J., concur.

Copies mailed to:

Tiffany C. Allen
Lori R. Cicero
Hon. Michael W. Krumholtz